Whitaker, Judge,
dissenting:
In my opinion, the result now reached by the majority is inconsistent with the court’s opinion delivered on January 16, 1957. In that opinion we held that the $5 charge made by plaintiff for an agreement to maintain the freezing units in its refrigerators for a period of four years, in addition to the customary one-year manufacturer’s warranty, was not a part of the sales price.
The case was then referred to Commissioner Akers to take proof on two things: first, whether the charge for the agreement to keep the freezing unit in repair for four years, in addition to the usual one-year warranty, was reasonable; and, second, whether in the taxable years in question it had become the custom of the trade for the manufacturer to agree to keep the freezing unit in repair for five years.
On the first question he found the charges were reasonable, and on the second he f oimd that this was the custom of the trade. It is this latter finding that has led astray at least some of my brethren.
Notwithstanding this finding, I still think the agreement to keep the freezing units in repair for four years, in addition to the usual one-year warranty, was no part oi the sales price of the refrigerator, but was something the manu *848 facturer agreed to give the purchaser, in addition to a refrigerator free of defects from workmanship and material.
The purchaser of an article from a manufacturer is entitled to no more than a warranty that the thing sold is free of defects in material and workmanship.
In the various trades the manufacturer is accustomed to fix a limited period within which such defects are supposed to appear, which varies with the article sold. In the case of electric refrigerators, the proof in the General Motors case clearly shows that the customary period from the time electric refrigerators were put on the market in 1920 until 1936 was one year. The proof also shows that if something went wrong with the freezing unit after the one-year warranty period, it had to be repaired at the customer’s expense. Because such repairs were frequently unsatisfactory, the General Motors in 1933 offered to its customers an agreement to make necessary repairs after the one year period for a charge of $6 per year.
Two years later, in 1935, General Motors offered its customers an agreement to keep the freezing unit in repair for a period of four years. Under the 1933 agreement this would have cost the customer $24, but General Motors reduced its price for this to $10. The following year General Motors further reduced its price to $5, for the agreement to keep the machine in repair for four years after the expiration of the one-year warranty; but, while the former agreements were optional with the purchaser, the new plan, called the “Protection Plan”, was obligatory.
But, even though the purchaser was required to take and pay for this “Protection Plan”, there can be no doubt that it gave the purchaser something in addition to the obligation of the manufacturer to remedy defects in material and workmanship, which had to appear within the one-year warranty period, in order to hold the manufacturer liable to make them without expense to the customer.
General Motors, being perhaps the largest manufacturer of electrical refrigerators, set the pattern for the industry, and when General Motors put into effect its “Protection Plan”, agreeing to keep the machine in repair for four additional years, whether the defects occurred from wear and *849 tear or from any other cause, other manufacturers felt obliged to follow its example. The result was that today all manufacturers of electric refrigerators sell their machines with the agreement to keep them in repair for a period of four years, in addition to the customary one-year warranty.
But, notwithstanding the fact that this has become the custom of the trade, it is nevertheless true that this “Protection Plan”, under which the manufacturer agrees to keep the machine in repair for four years in addition to the usual one-year warranty, is an agreement over and above the obligation of the manufacturer to make repairs appearing within the usual one-year warranty period, that is, repairs necessitated by defects in material and workmanship.
The usual one-year warranty was given to discharge the manufacturer’s obligation to sell a sound article, free from defects in material and workmanship. He could not make a charge therefor and claim that it was not a part of the sales price, because the sales price was for a sound machine— all as more fully explained in our prior opinion. But, the manufacturer could properly make a charge for a maintenance contract, beginning after the end of the warranty period, because this was a contract to make repairs not required under its warranty that the machine it had sold was free from defects.
I think this is a proper analysis of the transaction. If it is, the $5 charge is no part of the sales price of the refrigerator, and, thus, is not subject to the excise tax.
For this reason, I dissent.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Richard H. Akers, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff, General Motors Corporation, at all times material to this cause of action, was and is a domestic corporation organized and existing by virtue of the laws of the State of Delaware with its principal place of business in the city of Detroit, Michigan.
*850 2. The Frigidaire Division has at all relevant times been a division or branch of the plaintiff with its principal office in Dayton, Ohio.
3. The principal business of the Frigidaire Division is the manufacture and sale of electrical appliances. During the period of the claim in this action, January 1, 1945, through August 31,1951, it sold the following products manufactured by it: household refrigerators (and refrigerating apparatus), electric ranges, electric water heaters, water and beverage coolers, ice cream cabinets, air conditioning equipment, quick freeze units, dehumidifiers, washers, driers, dishwashers and similar appliances and equipment.
4. During the period of the claim in this action, certain of the articles manufactured and sold by the plaintiff were subject to the manufacturer’s excise tax imposed by Section 3405 of the Internal Revenue Code of 1939. The plaintiff filed timely returns and paid manufacturer’s excise taxes upon its sales prices of such articles.
5. The Commissioner of Internal Revenue (hereinafter sometimes referred to as the “Commissioner”) has assessed and the plaintiff has paid additional manufacturer’s excise taxes for the period of January 1, 1945, through August 31, 1951, in the amount of $2,484,901.09, plus interest in the amount of $108,543.40. Payments of the above amounts were made to the Collector of Internal Revenue at Cincinnati, Ohio, on the dates and in the amounts as follows:

The basis for such additional taxes was the inclusion by the Commissioner as a part of the selling price of the various appliances of the charge made by plaintiff for a Protection Plan (hereinafter more particularly described both as to its nature and to its relationship to the selling price) on various products subject to the manufacturer’s excise tax, including household refrigerators, air conditioners, water *851 heaters, food freezers, and on replacement units for certain of such products. The amount received by the plaintiff from this source in the period here involved and on which the additional taxes were computed aggregated $27,833,912.00, of which $2,484,901.09 was treated and assessed by the Commissioner as manufacturer’s excise tax thereon.
6. The plaintiff has not included any excise tax on the amount received by it for the Protection Plan, either as part of the charge for the plan or as part of the price of the products covered by such plan, and has not collected the amount of any such tax from the purchasers of its products. However, the Commissioner collected taxes on the amount received for the Protection Plan at the rate of 1/llth thereof, the rate of tax at the time being 10 percent.
7. On May 21,1951, and October 31,1952, the plaintiff duly filed, pursuant to the applicable law and regulations, claims for refund with respect to the additional taxes and interest described in finding 5, in the total amount of $2,593,444.49. The plaintiff has not been informed of any final action by the Commissioner or any other official on such claims for refund.
8. The gross sales of taxable products by the plaintiff’s Frigidaire Division during the period of the claim in this action, January 1, 1945 through August 31, 1951 was $772,374,823.42.
9. The practice of a manufacturer of expressly warranting his products against defects in workmanship and material or other manufacturing errors which are in the product at the time it is delivered to the purchaser has often been followed. The period of such warranty has varied depending upon the nature of the product and the use to which it is normally put. In the refrigeration industry, by the late 1920’s, one year had come to be recognized and observed by most manufacturers as the appropriate period of that warranty, hereinafter sometimes referred to as the “One-Year Warranty.”
10. The plaintiff adopted the One-Year Warranty for its products about the middle of the 1920’s and has continued that warranty through the present time. It has been plaintiff’s experience that to the extent there are defects in its *852 products attributable to workmanship and materials or other manufacturing errors, such defects usually appear within the first year of use of the product. Thus the One-Year Warranty was a recognition by the plaintiff of its obligation as a manufacturer to provide products free from such defects.
11. Under the One-Year Warranty the plaintiff undertakes to repair or replace any part or parts of the product found to be defective in workmanship or material or diie to other manufacturing errors within one year from the date of delivery to the original purchaser. The original purchaser (sometimes otherwise referred to herein as “ultimate consumer” or “original user”) is the first purchaser who becomes a user of the product,; for example, the first householder who purchases an appliance from a dealer and has it installed in the home. Under certain circumstances when a product becomes inoperative after the expiration of the One-Year Warranty, because of defects in workmanship or material or because of other manufacturing errors, the plaintiff considers that such defects should be remedied as part of its manufacturer’s obligation and as a normal practice charges the expenses necessary to remedy them to the One-Year Warranty reserve, described below.' However, defects of the character described in the preceding sentence arise in only a few instances and are recognized by the plantiff by reason of some particular difficulty with the product.
12. No separate charge has ever been made by the plaintiff for the One-Year Warranty and at all times an amount calculated to cover the probable expense thereunder has been set up as a reserve, which has been taken into consideration in determining the selling price of the manufactured article. The plaintiff’s method of calculating this reserve has varied. Originally a fixed figure of one dollar or two dollars was allowed but in more recent years a percentage of manufacturing costs has been set aside to cover probable expenses under the One-Year Warranty.
13. Performance under the One-Year Warranty is carried out under a joint arrangement between the plaintiff, as the manufacturer, its distributor, and the dealer who sells the product to the original user. The plaintiff, through its dis *853 tributors, supplies the necessary material and absorbs the transportation expenses in connection with such material, while the dealer is responsible for labor and installation charges.-
14. The reserve established by the plaintiff for the One-Year Warranty is charged with all expenses incurred by the plaintiff in performing the One-Year Warranty obligation as well as certain other expenses incurred in repairing defects in workmanship and materials or other manufacturing errors which appear after the expiration of the One-Year Warranty period as indicated in the preceding finding. Such reserve is treated by the plaintiff as one involved in the manufacturer’s cost of products manufactured and sold, and is closed out each year directly as an item of profit and loss on current operations.
15. During the period January 1,1945, through August 31, 1951, the plaintiff continued to give the standard manufacturer’s warranty of one year on its products. Unlike the charge for the Protection Plan (hereinafter more particularly described), the charge for this One-Year Warranty was not separately billed and accounted for but was computed into the sales price of the products which was used as the basis for the excise tax paid by the plaintiff. In other words, the anticipated expenses of fulfilling the warranty were not separately charged to the purchasers of plaintiff’s products but were taken into consideration by the plaintiff as expense items in fixing the price of its products.
16. The plaintiff expended approximately $6,044,504.02 to fulfill its obligations under the One-Year Warranty applicable to taxable products sold during the period of this claim, January 1, 1945, through August 31,1951. That figure, however, is subject to verification by the defendant in the event it should become material in determining the amount of recovery under the plaintiff’s second cause of action.
17. Until 1933 independent dealers and, in some cases, distributors, who sold the plaintiff’s products but' were otherwise unaffiliated with the plaintiff, performed the bulk of the repair service required upon the products manufactured *854 by the plaintiff following the expiration of the manufacturer’s One-Year Warranty.
18. In 1933 the plaintiff concluded that the service rendered by numerous of its dealers and distributors might be inadequate and determined to expand its own facilities and enlarge the scope of its own repair operations with the objective of providing for all the users of its products a high quality and low priced service. Since the late 1920’s the plaintiff had provided some repair services at Dayton but had confined itself principally to selling service parts to dealers and others.
19. To carry out the objective described in finding 18, the plaintiff commenced to sell optional “Frigidaire Service Agreements” on its products in the latter part of 1933. Similar agreements variously called repair or maintenance agreements, had theretofore been widely used by dealers and distributors in the servicing of refrigeration products, and the plaintiff had encouraged the sale and use of such agreements.
20. Under the Frigidaire Service Agreement which it sold from late 1933 through 1935, the plaintiff agreed to repair, adjust and maintain, as necessary, the mechanical refrigerating unit on any product with respect to which the agreement was purchased. The agreement was sold to cover a period of one, two or three years following the expiration of the manufacturer’s One-Year Warranty, at a cost of $6 per year, and its purchase was optional with all purchasers of products manufactured by the plaintiff.
21. To enable it better to perform repair services under the Frigidaire Service Agreement it sold, the plaintiff established repair service stations in New York, New York; Kansas City, Missouri; Oakland, California; and Atlanta, Georgia, in addition to the shop already in operation in Dayton, Ohio.
22. In 1935 the plaintiff introduced and began to sell another type of service or maintenance agreement called a “Four-Year Replacement Contract.” The plaintiff limited this agreement to the rotary type of mechanical refrigerating unit which powered certain of the products sold by it. Under this agreement the plaintiff undertook to replace such *855 unit in the event it became inoperative within four years following the expiration of the manufacturer’s One-Year Warranty. The cost of the agreement was $10 and its purchase was optional with the purchaser of products manufactured by the plaintiff.
23. No manufacturer’s excise tax was assessed or collected by the Commissioner on the amounts received by the plaintiff from the sale of Frigidaire Service Agreements and Four-Year Eeplacement Contracts in 1933, 1934, and 1935, when the purchase of such agreements was optional, although the products which they covered were subject to such tax.
24. In 1936, for reasons hereinafter set forth (see findings 27 and 28) the plaintiff discontinued the sale of both the Frigidaire Service Agreement and the Four-Year Eeplacement Contract and instituted the Protection Plan. The Protection Plan, like the Four-Year Eeplacement Contract, is an agreement by the plaintiff to repair or replace the refrigerating unit (or, in plaintiff’s parlance, the “sealed unit”) in one of plaintiff’s products if the unit becomes inoperative within a prescribed period. In the case of new products, plaintiff’s obligations and performance under the Plan commence one year after delivery of the protected product to the first user thereof (i. e., immediately upon the expiration of the One-Year Warranty) and continue for a period of four years thereafter. As will hereinafter appear, at or about the same time, it became customary in the trade for other manufacturers of household refrigerators containing a sealed-in refrigerating unit, in the sale of their products, to include an agreement similar to that of plaintiff described above.
In addition to sales of the Protection Plan on new products plaintiff also sold the plan in connection with sealed units which are inserted as replacements for inoperative units in products as to which neither the One-Year Warranty nor the Protection Plan was then in effect. When a sealed unit in such a product failed, the user could turn in (or “exchange”) the defective unit and purchase from the plaintiff both a replacement sealed unit and the Protection Plan thereon, in which case the plaintiff’s obligations and per *856 formance under the plan commenced immediately upon the installation of the replacement unit and continued for a period of four years thereafter.
The One-Tear Warranty on new products did not apply to such replacement units; where a user turned in a defective unit from an out-of-warranty product and purchased a replacement unit without the Protection Plan, he received only a 30-day warranty on that replacement unit.
25. The physical activities of the plaintiff and others acting under its direction in discharging the plaintiff’s obligations under the Protection Plan related exclusively to the re-operation of the refrigerating unit.
Neither the charge for the Protection Plan nor the expenses which the plaintiff expected to incur in performing its obligations under the Protection Plan entered into the unit prices which the plaintiff otherwise charged for its products in 1936, when the Protection Plan was instituted, or at any time thereafter.
26. Whereas the Frigidaire Service Agreements of 1933-35 and the Four-Year Replacement Contracts of 1935-36 had been sold by the plaintiff at the option of purchasers of its products, since the institution of the Protection Plan in 1936 the plaintiff has required that the plan be purchased on every product to which it was applicable except that in the case of purchasers of the plaintiff’s ice cream cabinets and “multiple unit purchasers” the plaintiff has, at various times, not required the purchase of the Protection Plan but has made it available at the option of such purchasers. A “multiple unit purchaser” is a purchaser who buys large quantities of products manufactured by the plaintiff, such as a builder, an apartment house owner, or a national account.
27. By the payment of the charge for the Protection Plan any purchaser thereof became entitled to the four-year protection which it afforded. The plaintiff’s purpose in substituting the Protection Plan for the agreements previously offered on an optional basis and in requiring all purchasers except “multiple unit purchasers” and purchasers of the plaintiff’s ice cream cabinets to come under the Protection Plan was to make better repair service available to all users of its products at a reduced charge.
*857 28. The plaintiff expected to increase substantially the number of participants in its service program over the number that had participated when the service agreements were offered on an optional basis. By thus broadening the coverage the plaintiff expected that it would be called upon to repair a smaller percentage of protected units than it had been required to repair under the optional plans previously sold by it.
The plaintiff also expected that the volume of repair business assured it through the increased number of participants would permit a substantial reduction in the unit cost of the services it was obliged to perform under the Protection Plan and had been obliged to perform under the service agreement sold in the three previous years.
29. The plaintiff’s institution of the Protection Plan and its decision as to the products to be covered and the extent to which purchasers of its products should be required to pay the additional charge for the Protection Plan were not influenced by the imposition of the manufacturer’s excise tax. Since the inception of the Protection Plan the plaintiff has manufactured and sold water coolers, beverage coolers, dehumidifiers, food freezers, and replacement units which at various times have not been subject to the manufacturer’s excise tax but were nevertheless at all times subject to the plaintiff’s requirement for the payment of an additional charge for the Protection Plan. Likewise, since the inception of the Protection Plan, plaintiff has manufactured and sold products which at various times have been subject to the excise tax — electric ranges, driers, dishwashers, and truck cooling units — as to which the One-Year Warranty but not the Protection Plan has been applicable.
30. Beginning in 1936 and throughout the period of the claim in this action, January 1, 1945, through August 31, 1951, the charge for the Protection Plan was $5 with respect to all products and models thereof on which the Protection Plan was sold except that for self-contained air conditioners the charge varied from $5 to $90 depending upon the size and type of the product.
31. Although the One-Year Warranty on new products covered the entire product (including the sealed unit) for *858 one year after delivery, and the Protection Plan covered only the sealed unit for four years after the expiration of the One-Year Warranty, the plaintiff’s sales department urged that when the terms of the two agreements were put in writing, they be phrased in such a way as to show separately (1) the total period of coverage on the sealed unit (five years) and (2) the coverage of all other parts of the product (one year). Accordingly, in order to make the agreements as simple and as clear to the user as possible, they were incorporated in a single certificate captioned “Frigidaire 5-Year Protection Plan” which reads as follows:
We warrant this Frigidaire refrigerator to be free from defects in material and workmanship under normal use and service.
5-TEAR WARRANTY ON SEALED IN MECHANICAL UNIT.-
At any time within five years from the date of delivery to the original purchaser, we will repair or replace without. cost to the owner or user the Sealed-in Mechanical Unit [consisting of the condenser, refrigerant control, freezer, Meter-Miser compressor unit, the tubing used to connect this equipment, and the Sealed Cold-Wall system, as shown in gold in the illustration at the right], or any part thereof, provided our examination shows that such apparatus is defective. This 5-Year Warranty applies only to the Sealed-in Mechanical Unit. All other parts of the refrigerator including temperature control and starting relay, are covered only by the 1-Year Warranty.
l-YEAR WARRANTY ON ENTIRE REFRIGERATOR. — At any time within one year from the date of delivery of this Frigidaire refrigerator to the original purchaser, we will repair or replace without cost to the owner or user any part or parts of the refrigerator, provided our examination shows such part or parts to be defective.
These warranties do not apply to light bulbs— or to any part of the Frigidaire refrigerator which has been subject to misuse, neglect, alteration, accident, or to damage caused by transportation after the original installation — or to any damage caused by flood, fire, or acts of God. Service calls, other than those covered by conditions specified in these warranties as our responsibility will be made at the expense of the user. These warranties apply only to refrigerators installed in the United States and Canada.
32. During the period of the claim in this action, the plaintiff, until February 1, 1946, in the regular course of business *859 sold the products manufactured by it directly to independent distributors, dealers, multiple unit purchasers, and infrequently to ultimate consumers. Plaintiff maintained during this time from seven to nineteen branch offices which handled its products essentially as distributors. After February 1, 1946, plaintiff sold its products to Frigidaire Sales Corporation, a wholly owned subsidiary corporation, and to independent distributors of whom there were approximately sixteen to twenty-five. Frigidaire Sales Corporation and the independent distributors sold in turn to independent dealers, whose number varied between 8,000 and 11,000, directly to multiple unit purchasers, and occasionally to ultimate consumers. The great bulk of the sales of the plaintiff’s products to ultimate consumers were made by independent dealers who had previously purchased either from the plaintiff directly, from independent distributors, or from Frigidaire Sales Corporation.
33. The plaintiff as a regular practice on all invoices rendered by it throughout the period of the claim covered by this action billed the Protection Plan separately from the unit price of the products which the plan protected.
34. The practices of the independent dealers, who numbered between 8,000 and 11,000 during the period of this claim, were not uniform with respect to the manner in which the products, on which the Protection Plan was sold, were invoiced to their customers. Some itemized the amount for the Protection Plan separate from the price for the product, while others rendered a bill in a single amount which included both the price for the product and for the Protection Plan. The dealers generally made known to prospective customers by various means the general nature of the Protection Plan and the fact that included in the total amount paid was an amount (usually $5) on account of the Protection Plan.
35. The plaintiff discharged its obligations under the Protection Plan by establishing and maintaining a cyclical flow of sealed units which operated essentially as follows: when the plaintiff entered upon the manufacture of a particular model of a particular product, it manufactured more sealed units than cabinets, thus creating a “bank” of extra sealed *860 units which were held in an inventory account and warehoused until such time as they were needed to replace units which became inoperative after delivery of the refrigerator to the user. The extra units were delivered, as needed, first to the plaintiff’s distributors and thence to dealers who installed them in refrigerators in which the original units had become inoperative. The inoperative unit, when removed from the refrigerator, was sent by the dealer to one of the plaintiff’s several repair shops for repair. After the repair shop had reoperated the unit, renovating it as completely as possible, the unit was returned to the “bank” for future use as a replacement unit, thus completing the cycle. In thus fulfilling its obligations under the Protection Plan, the plaintiff’s usual practice, as just shown, was to replace a defective or inoperative unit with one obtained from its “bank” which was in operating condition rather than to repair and return to the same customer the unit which had been found inoperative. At no time, during the period here involved, did the plaintiff or its distributors or dealers, in the fulfillment of the plaintiff’s obligations under the Protection Plan, make any cash refunds or credits to the ultimate consumer-purchaser of the products involved in this action on account of defective or inoperative units. The plaintiff had no direct transactions with the ultimate purchaser-users of refrigerators in connection with the fulfillment of plaintiff’s obligations under its Protection Plan.
36. The sealed units that were installed and replaced as described in finding 35 and repaired in the plaintiff’s repair shops (as hereinafter described) included all sealed units which the plaintiff had undertaken to replace and repair, including units replaced under the One-Year Warranty, units replaced under the Protection Plan, and units replaced on an out-of-warranty “exchange” basis as described in fmdiug 24.
37. The actual repairing of defective sealed units was conducted in shops devoted exclusively to such operations. The shops were located as follows during the period of the claim in this action: New York City, New York (until December 1948); Newark, New Jersey (from January 1949); Atlanta, Georgia (until August 1950); Kansas City, Missouri; and *861 OaHand, California. In addition to these so-called “zone shops”, the plaintiff in the same period maintained a similar repair shop at one of its main centers of activity in Moraine City, Ohio. Although the Moraine City repair shop was physically located in the same building with other operations conducted by plaintiff, the personnel and equipment in the shop, as in the case of the zone shops, were exclusively engaged in the repairing of sealed units.
38. When a dealer determined that the sealed unit in a product manufactured by the plaintiff and owned by a user (entitled to service thereon) had become inoperative, the dealer would send to his distributor (or a branch of the plaintiff or Frigidaire Sales Corporation) an order for a replacement unit, furnishing on a standard form detailed information as to the product and the inoperative unit involved (including the identifying unit serial number). He would also indicate on the form whether the unit was to be replaced under the One-Year Warranty, under the Protection Plan, or upon an out-of-warranty “Exchange” basis.
39. The distributor (or branch or Frigidaire Sales Corporation) having purchased (and been charged by the plaintiff for) a number of crated sealed units from the “bank” in anticipation of such dealer orders, would ship and charge an appropriate crated unit to the dealer, simultaneously giving the plaintiff’s offices in Dayton, Ohio, and either the Moraine City repair shop or the zone shop nearest the particular dealer full information (on a standard form) as to the product, the unit, and the classification (One-Year Warranty, Protection Plan, or Out-of-Warranty).
40. Upon receipt of the crated replacement unit, the dealer would remove the inoperative unit from the cabinet in the user’s home, unpack and install the replacement unit, pack the inoperative unit in the crate in which the replacement unit had been received, and ship the crated inoperative unit to the repair shop for repair, using shipping documents furnished with the crate by the distributor (or branch or Frigidaire Sales Corporation).
41. Upon receipt of the inoperative unit, the repair shop would make the necessary repairs, recrate the unit and store it in the “bank” warehouse until ordered by a distributor (or *862 branch or Frigidaire Sales Corporation) for re-use as a replacement unit.
42. As each inoperative unit was received at a repair shop, the plaintiff gave the distributor (or branch or Frigidaire Sales Corporation) who supplied the replacement unit to the dealer credit for the returned unit. The returned unit was then placed in inventory and the plaintiff’s “bank” inventory was thus brought back to its original level. .Upon receipt of credit from the plaintiff, the distributor (or branch or Frigidaire Sales Corporation) gave a corresponding credit to the dealer who installed the replacement unit. In this cycle of transactions (plaintiff to distributor to dealer to plaintiff) every distributor and dealer charged for a sealed unit subsequently received an offsetting credit upon receipt by the plaintiff of the inoperative unit replaced; hence no such distributor or dealer was ever obliged to pay for a sealed unit used in the repair-and-replacement operation.
43. Although the plaintiff’s zone shops were equipped to handle the majority of the repair problems encountered in the reoperation of sealed units, one operation — that of re-operating the so-called “compressor” of the sealed unit — was performed only at the repair shop located at Moraine City, Ohio.
44. The total expenses shown by the plaintiff’s books as representing its costs through December 31,1956, of fulfilling its obligations under Protection Plans sold from January 1, 1945, through August 31,1951, were $12,621,562.12, and were made up of the following major categories of expense:
Cash payments to distributors and dealers— $2,260,166. 51
Freight_ 1, 290, 551. 25
Unit reoperation (less compressor)_ 4, 708,199. 64
Compressor_ 1, 922, 750. 97
Units scrapped_ 935, 414. 92
Tools and equipment_ 79, 640. 82
Commercial expense_ 1,178, 066.12
Experimental_ 560. 85
Obsolete and unsalable stock scrapped_ 70, 858. 73
Miscellaneous_ 137, 866.12
Water heaters (total expenses)[1]_ 37,486.19
Total_ 12, 621, 562.12
*863 45. In the first six months of 1957 plaintiff incurred further expenses in the amount of $92,457.28 in fulfilling its obligations under Protection Plans sold from January 1, 1945, through August 31,1951.
46. There is set forth in the following subparagraphs a description of the types of expenses treated by the plaintiff as the costs of its performance of its sealed unit operation as a whole, whether or not the performance was under a warranty :
(a) Gash payments to Distributors (including branches) and to Dealers. Distributors and dealers were required to make out-of-pocket expenditures, in cash or in kind, in connection with the plaintiff’s repair and replacement programs, and for such of these expenditures as were made with respect to units handled under the Protection Plan, the plain: tiff provided for reimbursement of the distributors and dealers involved by means of cash payments, sometimes referred to herein for convenience as “allowances.” These cash payments were (i) to reimburse the distributor for the clerical-administrative costs incurred by him in ordering replacement sealed units from the plaintiff, in warehousing and keeping accounting records of such units, in handling shipping documents, and in generally doing the “paper work” required of the distributor by the plaintiff’s programs; (ii) to reimburse the dealer for similar “paper work” expense and for labor charges in handling replacement and inoperative sealed units as described in findings 39 and 40. All “allowances” described above were paid at fixed per-unit rates for each unit processed by the distributor or dealer receiving the “allowance” and all were actual payments (or credits) by the plaintiff.
(b) Freight. The sealed unit operation involved freight on three kinds of shipments; (i) shipment of replacement units to distributors (prepaid by the plaintiff); (ii) shipment of such units to dealers by distributors or branches and charged to'the plaintiff; (iii) shipment of inoperative units by dealers to the plaintiff’s repair shops (shipped collect).
(c) Unit Reoperation (less Compressor), Compressor Reoperation, and Tools and Equipment. The major categories of expense incurred by the plaintiff in reoperating *864 sealed units at its repair shops consisted of the following: (i) labor charges consisting of the wages paid by the plaintiff, according to time cards, to the full-time employees of the shops, including ordinary workmen, foremen, clerical workers, material handlers, and inspectors; (ii) payroll taxes and fringe benefits (including hospitalization insurance, vacation allowances, etc.) for the foregoing employees; (iii) an allocated portion of the expenses of the office of the superintendent of the Moraine City plant based upon the labor recorded by the Moraine City repair shop personnel as compared by the total labor recorded in the other operations supervised by that superintendent; (iv) material (spare parts, etc.) built into units in the process of reoperation; (v) supplies used in the repair shops (such as small tools, clerical forms, oil, rags, etc.) ; (vi) special light tools and equipment (such as pressure gauges, “black light” equipment for testing for leaks, etc.) which were used only in the repair shops and were not fixed capital (i. e., depreciable) assets; (vii) power, light and heat charges based on actual meter readings at the zone shops and on an allocation according to “demand usage” or square feet of space used at Moraine City; (viii) depreciation of fixed assets including machinery and that portion of the Moraine City plant occupied by the repair shop; (ix) rent of the space occupied by the zone shops; (x) maintenance charges on plant and equipment; (xi) state and local taxes and insurance on repair operation inventories.
(d) Units Scrapped. Although all units in the “bank” described in finding 35 were carried at manufacturing cost in a continuing inventory account and thus were not charged as an expense of the sealed unit operation so long as they remained in an operating condition, from time to time inspection of an inoperative unit indicated that the unit was beyond repair, and the manufacturing cost of such a unit was then charged off as an expense.
The cost of replacement units sold by the plaintiff to its distributors (or its branches acting as distributors or Frigidaire Sales Corporation) for inclusion in the distributor’s inventory or bank of available units for replacing those which developed defects in the hands of individual purchasers of the plaintiff’s products during a warranty period, *865 were accounted for by the plaintiff as part of the manufacturer’s cost of sales, and not as a part of the expense of fulfilling its obligations under the Protection Plan. All employees of the plaintiff’s sealed unit and compressor re-operating plants at Dayton and Moraine City, Ohio, were carried on the payroll of the operations at such plants.
(e) Commercial Expense. Also charged to the sealed unit repair-and-replacement operation were the clerical and other expenses of handling and storing units and spare parts between the plaintiff’s manufacturing plant, and repair shops, and its distributors, of billing and crediting distributors and dealers, of maintaining statistical records, and of handling the general accounting activities necessarily involved in the cyclical operation.
(f) Experimental Expense. To this account the plaintiff charged only the expenses incurred by the regular full-time employees of the repair shops in developing improvements in repair techniques.
(g) Obsolete and Unsalable Stock Scrapped. Particular sealed unit models and parts therefor were manufactured by the plaintiff simultaneously with the products they would later be used to repair, and the plaintiff’s estimates of the quantities required occasionally turned out to be too high in the light of subsequent developments. In such cases the obsolete units and parts were scrapped and charged as an expense of the sealed unit operation, as were the costs of units and parts which were rendered unfit for use by physical deterioration or damage.
(h) Miscellaneous. The plaintiff charged to a “miscellaneous” account a variety of items such as the cost of shipping compressors from zone shops to Moraine City and back, the cost of making certain special repairs which could not be performed in the regular repair shops and therefore had to be done elsewhere, and the cost of converting particular sealed units into another kind of unit mechanism where available stocks of the latter were low.
47. The expenses detailed in finding 46 do not include: (i)supervisory administrative expenses above the level of works manager; or (ii) specialized service expense such as the cost of services rendered to the sealed unit operation by *866 the plaintiff’s sales, advertising, central office, public relations, patent, engineering, and design personnel. The works manager just referred to is the production official who is in charge of the superintendents of the various operating plants.
48. All entries made on the plaintiff’s accounting ledgers, as heretofore described, were made in accordance with the accounting principles and practices in use throughout the General Motors Corporation and there is no evidence that the allocation methods used were designed, or used, for any purpose other than the accurate reflection of the costs of the sealed unit operation.
49. The plaintiff’s repair shops kept monthly records of the number of inoperative sealed units received, and they segregated the accounts according to the type of product and the warranty classification; monthly returns rendered by the repair shops gave the plaintiff an accurate count of (for example) the number of inoperative sealed units returned each month from 1946 model refrigerators under the One-Year Warranty, the number of such units returned from 1946 model refrigerators as to which the Protection Plan was still in effect, and the number of such units returned from 1946 model refrigerators as to which neither was then in effect.
50. The returns furnished by the repair shops and similar reports supplied directly by distributors (see finding 38) furnished the basis upon which the plaintiff paid out the cash payments or “allowances” (see finding 46). Thus the expense incurred by the plaintiff as “allowances” for the handling of units covered by the Protection Plan was determined by reference to the actual physical units involved.
51. The plaintiff found from its experience that although the expense of processing sealed units through the repair- and-replacement cycle (including shipment, physical repair, storage, etc.) might vary greatly as between any two particular units, over a period of time there was no significant difference between the average costs of processing (i) units which at the time of their repair were covered by the One-Year Warranty, (ii) units which at the time of their repair were covered by the Protection Plan, and (iii) units which *867 at the time of their repair were not covered by either of the foregoing contracts.
52. Eelying upon the determination described in finding 51, the plaintiff computed the expense (other than “allowances” — see finding 50) attributable to the fulfillment of its obligations under the Protection Plan during a given period by allocating as Protection Plan expense that portion of the total repair-and-replacement expense for the same period which bore the same proportion to the total expense as the number of sealed units returned under the Protection Plan bore to the total number of sealed units returned to repair shops during the period involved. Thus (to use a hypothetical example) if 500 sealed units, of which 100 were from 1946 model refrigerators covered by the Protection Plan, were returned to the plaintiff’s repair shops in December 1948, and if the total expense (other than cash “allowances” of the repair-and-replacement operation for the same month was $5,000 (as described in finding 46) the plaintiff would record $1,000 (plus cash “allowances”) upon its books as the December, 1948, expense of fulfilling its obligations mider the Protection Plan with respect to 1946 model refrigerators.
53. The manner in which the plaintiff ascertained the expenses attributable to the fulfillment of its obligations under the Protection Plan (as described in finding 52) resulted in a fair and proper determination of such expenses. The total expenses incurred by the plaintiff through June 30, 1957, in fulfilling its obligations under Protection Plans on taxable products sold during the period January 1, 1945, through August 31,1951, were $12,714,019.40.
54. The expenditures entering into the amount of $12,-714,019.40 stated in finding 53 were made within the period January 1, 1945, through June 30, 1957, as follows:
1945_ $101,724.97
1946_ 184,123.43
1947_ 352, 659.13
1948_ 741,254. 35
1949_ 1,235,732.65
1950_ 1,602,965.91
1951_ 2,092,664.84
1952_$2,220,652. 52
1953_ 1,680,149.14
1954_ 1,107,397.18
1955_ 759,914. 66
1956_ 542,323.34
1957_ 92,457. 28
55.All of the expenses incurred by the plaintiff in performing its agreement under the Protection Plan were *868 charged to a special account, “Protection Plan — Warranty [Reserve.” No expenses were charged to this account other than those classified by the plaintiff as allocable to fulfillment of the Protection Plan. All of the amounts collected by the plaintiff for Protection Plans were credited to the special account called “Protection Plan — Warranty Reserve.” Protection Plan collections were the only amounts credited at any time to this account. Within this account both collections and expenses were segregated in accordance with the product line and model year (e. g., 1945 model refrigerators) to which they were applicable.
56. The “Protection Plan — Warranty Reserve Account” is segregated by model lines. This account is reviewed by the plaintiff at least annually and at times more often. At the end of a given period of four to six years when it is felt that all-obligations under the Protection Plans for a particular model year involved are completed, any debit or credit-balances remaining in the account are closed out to an account designated “Miscellaneous Income Account” which is a type of profit and loss account on previous years’ operations.
57. Since the early 1930’s contracts to provide repair or maintenance service following the expiration of the manufacturer’s warranty have been widely sold in metropolitan areas by independent service and repair companies which do not manufacture or sell the refrigerators which their repair contracts cover.
58. Beginning late in 1983 some manufacturers of household refrigerators commenced to sell a service contract which entitled purchasers of their products to the repair or replacement of the sealed refrigerating unit if it should become defective within four years following the expiration of the standard One-Year Warranty which covered the entire product, and by 1936 approximately two-thirds of the manufacturers of household refrigerators were selling such contracts. Since approximately 1937 the plaintiff and possibly one other manufacturer of household refrigerators have continued to sell service contracts on the sealed units of their products of the character just mentioned, and have required each individual purchaser of a household refrigerator to pay a separate charge therefor. Since approximately the same time the *869 other principal manufacturers of household refrigerators have stated a single price for their products together with the sealed unit repair or replacement agreement of substantially the same kind as that of the plaintiff, just mentioned, and have presumably passed on to their purchasers the excise tax effected upon the full amount of such price since the excise tax was apparently computed by them upon such price which included the price not only for the refrigerator but also for the agreement to repair or replace the sealed refrigerating unit for the four-year period following the expiration of the One-Year Warranty period. However, as heretofore shown, the plaintiff in computing an excise tax upon the products sold, which were covered by the Protection Plan, did not include the $5 charge for the Protection Plan as a part of the price of such products, and did not collect such a tax thereon from its customers.
59. From 1941 to date it has been the general practice of household electric refrigerator manufacturers to agree to repair or replace the sealed refrigerating units in their products if they should become inoperative after the expiration of the One-Year Warranty and prior to the expiration of the fifth year of use by the original purchasers, that is, since 1941 it has been the custom in this industry to give a warranty substantially equivalent to the Protection Plan involved in this suit.
60. During the period covered by the claim in this action, 1945 through 1951, the plaintiff sold from 20 to 25 percent of all household refrigerators sold in the United States.
61. In substantially all cases the service required on the sealed units of fehe plaintiff’s refrigerators, after the expiration of the One-Year Warranty, is attributable to certain types of wear and tear in the use of the product or to other factors beyond the control of both the plaintiff and the user of the product, such as operation of the unit under low voltage.
62. Throughout the years from 1986 to 1951, except the war years 1942 to 1945, inclusive, approximately 36 percent of the total number of sealed units of the plaintiff’s household refrigerators which became inoperative from all causes within five years after sale to the original purchaser and which were returned to the plaintiff for reoperation, did so *870 in the first year of use; approximately 20 percent became inoperative in the second year of use, 16 percent in the third year, 15 percent in the fourth year, and 13 percent in the fifth year of use.
63. The plaintiff has never considered that its obligation as a manufacturer to provide products free from defects in workmanship and material or other manufacturing errors extends beyond the period covered by its One-Year Warranty.
64. The Protection Plan constitutes an additional obligation assumed by the plaintiff at the time of the sale of the product to which it applies, which requires plaintiff to perform repair service on such product after the first year of usage through the fifth year of usage, and the obligation thus assumed is, and has been for many years, a general practice in the industry under similar circumstances.
65. Under the plaintiff’s Protection Plan it was the practice in the years here involved to repair or replace without charge inoperative sealed cooling units during the second to fifth years inclusive of use, whatever the reason therefor, except flagrant misuse of the product. In its performance under the Protection Plans, the plaintiff at no time had any direct transactions with purchaser-users, nor did the plaintiff pay cash or give credit to them against the original purchase prices of the refrigerators covered by the Protection Plans.
66. In June 1934, the NBA Code for the electrical refrigeration industry fixed the One-Year Warranty against defects in material or workmanship as the required obligation of a manufacturer of household refrigerators, and further provided that- arrangements for repair or replacement service beyond that period might be worked out by individual plans. The National Eecovery Administration was created under authority of the Act of Congress of June 16, 1933 (48 Stat. 195), and was terminated on April 1, 1936, under the terms of Joint Eesolution No. 26, under date of June 14, 1935 (49 Stat. 375).
67. The Federal Specifications for electric refrigerators which are developed by various Government agencies, including the Bureau of Standards, prescribe the features and char *871 acteristics of refrigerators for the use of all Federal agencies in their purchasing programs. Throughout the period 1941 through 1956, the Federal Specifications provided for a One-Year Warranty on electric refrigerators, but made no mention of the Protection Plan or any comparable repair contract or extended warranty on the sealed units. In 1950 the applicable Federal specification read in part as follows:
Service guarantee. — The contractor guarantees the equipment against defective material, workmanship, and performance for a period of 1 year, said guarantee to run from date of acceptance of the equipment by the Government. The contractor agrees to furnish, without cost to the Government, replacement of all parts and materia] which are found to be defective during the guarantee period * * *.
68. During World War II, the Service Division of the Office of Price Administration was charged with the supervision of the plaintiff’s Protection Plan charge.
69. During the Korean War the Office of Price Stabilization ruled that the plaintiff’s Protection Plan charge was covered by OPS Ceiling Price Kegulation No. 34, governing “Services.”
70. Both the Office of Price Administration and the Office of Price Stabilization considered the expenses attributable to the fulfillment of the plaintiff’s One-Year Warranty as part of the plaintiff’s manufacturing costs for the purpose of determining the elements of the plaintiff’s price for its products.
71. As shown in finding 26, since its institution in 1936, the plaintiff has required that the Protection Plan be purchased on every product to which it was applicable except that in the case of purchasers of the plaintiff’s ice cream cabinets and “multiple unit purchasers” the plaintiff has, at various times, not required the purchase of the Protection Plan but has made it available at the option of such purchasers.
72. The amounts received by the plaintiff by reason of the Protection Plan were to cover services and obligations to which the plaintiff committed itself under the Plan and to cover estimated expenses of fulfilling such commitments.
73. The $5 charge made by the plaintiff for the Protection Plan was based upon the plaintiff’s determination at the *872 time the Plan was first sold in 1936 that the probable cost for the repair of a single unit would be approximately $25 and that no more than 20 percent of the units sold would become inoperative during the four-year period of the Protection Plan. On that basis it was determined that $5 from each purchaser of its products would meet the anticipated costs.
74. The plaintiff has re-examined its Protection Plan charge annually, and sometimes oftener, since the Plan was first sold.
75. A comparison of Protection Plan collections and expenses incurred in fulfilling the plaintiff’s obligations under Protection Plans sold from 1936 through 1951 is approximately as follows:

The above table reflects for each model year, expenditures incurred over a period of approximately six years. For example, the amount of $298,447.16 shown as “Expenditures Incurred through 6-30-57” for Protection Plans sold on 1945 models represents expenditures incurred under these Plans from a year after the dates on which they were sold to the ultimate user in 1945 through the date when the last Protection Plan obligation on 1945 models expired. Thus the total expenditures incurred under Protection Plans sold with 1945 models was not known to the plaintiff until about the end of 1951.
*873 76.The average cost to the plaintiff of replacing a sealed unit nnder the Protection Plan from 1937 to 1956 was as follows:

77. The plaintiff’s annual re-examination of its Protection Plan charge takes place at a meeting in September of each year between officials representing the plaintiff’s engineering, financial, sales, and production departments and the general manager of the Frigidaire Division. At the meetings data and records covering past experience in respect to allocated costs of fulfilling Protection Plan obligations, and estimated future costs are analyzed. The plaintiff’s experiences under its One-Year Warranty, as well as its Protection Plan Warranty, are also considered. As a result a determination is arrived at of the charge to be made for the Protection Plan. The plaintiff’s product-pricing is not considered at such meetings.
78. At these annual meetings the plaintiff’s past experience with its Protection Plan is considered in relation to its allocated costs per unit of repair and replacement; the number and percentage of units of each year’s model that have become defective; the period in which the products became defective; the number of units remaining covered by the Protection Plan and the further time during which those units would be covered; past collections and reserve account balances, and expenditures which might be anticipated in connection with various previous years’ models.
79. For the purpose of estimating future costs on outstanding Protection Plans in connection with the annual examination of the Protection Plan charge, the plaintiff estimates on the basis of experience to date the number of units which will become defective over a future period of up to six years, a period during which the plaintiff’s obligations *874 under the Protection Plan for a given model might be outstanding. Along with past experience, the plaintiff considers all engineering changes in both design and materials as well as service factors in its models which might affect the future rate of defectives.
80. In estimating the future cost of replacing defective units under its Protection Plan, the plaintiff in its annual examination of the charge takes present costs of replacement and adds a 20 percent contingency to cover probable increases in costs over the future period of approximately six years.
81. Although the plaintiff examined the Protection Plan charge for the years 1945 and 1946, the charge was maintained at the pre-war level because the plaintiff was just starting its peace-time production and there was no reliable post-war experience upon which to base any change in the charge. As will hereinafter appear, the $5 charge continued until September 1953, when it was changed to $3.50 for the 1954 models.
82. The first full-scale meeting on the Protection Plan after World War II was held in September 1946 to examine the charge and determine what it should be for the following year. At that time the plaintiff anticipated high future costs in fulfilling its obligations under the Protection Plan and therefore considered an increase in the Protection Plan charge. Among the factors considered were that many of the plaintiff’s workmen were inexperienced, that many substitute materials had to be used in the plaintiff’s products and that the limited post-war experience on the Protection Plan had not been good. An increase in the Protection Plan charge would have required the approval of the Services Division of the Office of Price Administration. Because of its experience with that Division in other matters, the plaintiff did not believe that such approval could be obtained. As a result of the foregoing considerations the plaintiff decided to maintain its Protection Plan charge at $5.
83. For the years 1947, 1948 and 1949, the plaintiff continued to re-examine the Protection Plan charge at least annually and decided to maintain the charge at $5 for these *875 years. Among the factors which the plaintiff considered in deciding to maintain the $5 charge were:
(1) The high rate of defectives during the first and second years of use of the plaintiff’s 1946 and 1947 models which was substantially greater than the rate experienced by the plaintiff on its pre-war models.
(2) The fact that in 1947 the plaintiff introduced a new refrigerant which operated under higher pressures than the refrigerant previously used, and it was the fear of the plaintiff’s engineering department that the new refrigerant might contribute to repair difficulties in the future.
(3) The plaintiff’s analysis on September 30, 1949, of its past and possible future expenditures under Protection Plans sold on replacement units during the post-war period indicated that losses amounting to $473,867 might be realized on replacement unit plans sold in 1947, $539,727 on such plans sold in 1948, and $306,173 on such plans sold in 1949.
84. In September 1950 the plaintiff’s annual examination of its Protection Plan charge revealed that the overall postwar experience had turned out better than previously anticipated and indicated in earlier years. The data presented indicated that it might be possible to reduce the charge at that time, but this was not done because the Korean War had begun and the plaintiff feared that there might be a return of war-time conditions similar to those experienced by the plaintiff during World War II which resulted in heavy losses on Protection Plans sold during those years.
85. In September 1953 the Protection Plan charge of $5 was reduced to $3.50 for 1954 models on the basis that plaintiff’s experience during and following the Korean War turned out to be better than had been anticipated. This was the first change in the charge for the Protection Plan. This revised charge was maintained through 1956.
86. The Protection Plan charge was increased in September 1956 from $3.50 to $4.25 for 1957 models on the basis that the rate of defectives for 1952 and 1954 models was higher than had been estimated.
87. In 1936 when the Protection Plan was instituted, the plaintiff offered it on an optional basis with respect to 1935 models as yet unsold to the ultimate consumer. Out of a *876 total of 12,000 products as to which the option to purchase the Protection Plan was thus extended, the option was exercised and the Protection Plan purchased with respect to approximately 7,000.
88. Substantial numbers of multiple-unit purchasers have exercised their option to buy the Protection Plan at the same charge made to purchasers who were required to buy it. For example, subsequent to the inauguration of the Protection Plan in 1936 and prior to January 1, 1942, approximately 100,000 household refrigerators were sold to multiple-unit purchasers by the New York branch of General Motors Sales Corporation, Frigidaire Division. • All such purchasers were extended an option to buy the Protection Plan but none were required to buy. The Plan was purchased to cover approximately 93,000 units and was rejected in seven percent of the cases. During the years 1946 through 1956 Frigidaire Sales Corporation’s offices in Chicago, New York, Baltimore, Boston, and Dayton sold a total of 208,221 units to multiple-unit purchasers who were extended an option to buy the Protection Plan but not required to buy it. The plan was purchased to cover approximately 179,537 units and was rejected in approximately 14 percent of the cases.
89. During the period of the claim in this action, the plaintiff sold its Protection Plan on ice cream cabinets on an optional basis because most, if not all, purchasers of this product were commercial concerns that maintained their own repair and service facilities. The plan covered the sealed unit of the ice cream cabinets which was similar to the unit in household refrigerators. For those purchasers of ice cream cabinets who wished to buy the Protection Plan it was sold at the regular $5 charge. From 1946 to 1956 the plaintiff sold a total of 371,942 ice cream cabinets. The purchasers of these units purchased the Protection Plan on an optional basis to cover 256,288 units, that is, approximately 69 percent of the total units purchased.
90. Many of the purchasers of ice cream cabinets who purchased the Protection Plan on an optional basis were large national companies which maintained their own service and repair facilities for their equipment capable of servicing and *877 repairing tbe ice cream cabinets sold to them by the plaintiff.
91. Repair contracts such as those described in finding 57 are sold to cover household refrigerators manufactured by the plaintiff. These contracts are sold on a yearly basis to cover either (a) repairs to the refrigerator relay and control systems after the expiration of the One-Year Warranty, or (b) to cover both the relay and control systems and the sealed unit after the expiration of the Protection Plan.
92. The. G & H Refrigeration Sales and Service Corporation of New York, New York, and H. V. Lohmiller, Inc. of Philadelphia, Pennsylvania (and its predecessor, J. J. Pocock) are independent organizations which have been engaged for a number of 'years in the business of selling repair contracts to cover refrigerators manufactured by the plaintiff on the basis described above. At the present time, the G & H Corporation has 16,712 repair contracts outstanding and H. V. Lohmiller, Inc. has approximately 8,000 such contracts outstanding. The G & H Corporation’s repair contract charges for the years 1951 and 1957 were as follows:
Repair of relays and controls and sealed unit, after the 5th year of refrigerator’s Per year use: 1951 1951
Individual household refrigerators_$10. 00 $10.00
Refrigerators in apartment houses_ 4. 00 5. 50
Charge attributable to coverage of the sealed unit only:
Individual household refrigerators_ 6. 00 5.00
Refrigerators in apartment houses_ 2. 50 3.50
H. V. Lohmiller, Inc.’s charges for 1953 and 1957 were as follows:
Repair of relays and controls and sealed Per year unit, after the 5th year of refrigerator’s 1358 lssr> use_ $9.50 $9.95
Charge attributable to coverage of the sealed unit only_ 4.55 4.45
93.The rate at which sealed cooling units are returned for repair or replacement within a few years after the expiration of the Protection Plan is not appreciably greater than the rate of returns during the Protection Plan period, particularly since in the later years many refrigerators are turned in on new models. The cost of repairing or replacing units which become defective after the expiration of the Protection *878 Plan is approximately the same as the cost under the Protection Plan.
94. The plaintiff’s $5 charge for the Protection Plan during the period of the claim covered in this action was a reasonable charge in light of the increasing costs of fulfilling the obligations and the difficulty of estimating, under the circumstances prevailing during the period with which we are concerned, those costs over a future period of approximately six years; the substantial risk of heavy losses which the plaintiff bore under the Protection Plan; the value of the Protection Plan to its purchasers; the high rate of acceptance of the charge among experienced buyers such as multiple-unit purchasers and buyers of ice cream cabinets; and, the substantially higher charge made by independent service and repair organizations for repair contracts comparable to the Protection Plan.
CONCLUSION 03? LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is therefore dismissed.

 Tile total expenses incurred by tbe plaintiff in fulfilling its obligations under Protection Plans sold in connection with electric water beaters have not been broken down into the various major categories of expense.